# EXHIBIT C

COMMONWEALTH OF MASSACHUSEETTS
SUPERIOR COURT DEPARTMENT

HAMPSHIRE, SS.                                          CIVIL ACTION NO. 2080CV00085

ALAN BOROWSKI,
    PLAINTIFF

V.

JODY KASPER, DOROTHY CLAYTON,
JOHN CARTLEDGE, JOHN DOE AND
CITY OF NORTHAMPTON
    DEFENDANTS

### PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

#### Introduction

This case is ultimately about how the leadership of the Northampton Police Department, including its Chief and two police Captains, became complicit and willing partners in a false and malicious smear campaign designed to undermine the Plaintiff's successful law enforcement career. Under the false guise of lawful "investigation," the Defendants gave life and presumed legitimacy to anonymous and false allegations involving the Plaintiff. In the process, the Defendants severely and negatively impacted the Plaintiff's career, attempted to humiliate him in the public eye and ruthlessly defamed him. This Complaint seeks to rectify that damage and set the record straight.

#### The Parties

1. Plaintiff Alan Borowski is a resident of Easthampton, Hampshire County. Plaintiff has been employed by the City of Northampton Police Department (hereinafter "NPD") for over twenty (20) years. He currently serves in the rank of Lieutenant. In 2014, he was promoted to head the Detective Bureau which is a prominent position within the Department. Prior to October 2017, the Plaintiff had a spotless disciplinary record. His performance record was marked by hard work, dedication and excellence.

2. Defendant Jody Kasper is a resident of Easthampton. She is employed as the Chief of Police for the NPD. She is sued in her individual and official capacity.

3. Defendant John Cartledge is a resident of Easthampton. He is employed as a Captain for the NPD. He is sued in his individual and official capacity.

4. Defendant Dorothy Clayton is a resident of Hatfield. She was formerly employed as a Captain for the NPD. She is sued in her individual and official capacity.

5. Defendant John Doe whose true name is not known to the Plaintiff is a resident of a place unknown to the Plaintiff and is subject to the jurisdiction of this Court.

6. Defendant City of Northampton is a duly organized municipality of the Commonwealth located in Hampshire County.

### Factual Background

7. In February 2016, a local resident known to the Plaintiff called the Plaintiff and asked about disposing pills connected to the resident's brother. The Plaintiff explained to the resident that the drugs could be safely disposed of in a lobby drop box at the NPD. When the resident arrived at the station, he requested that the Plaintiff put the drugs in the disposal box.

8. After a conversation with Detective Peter Fappiano of the NPD drug task force, it was determined that the pills should be removed from the disposal box. Defendant Cartledge was present during the conversation between the Plaintiff and Fappiano and was aware of the relevant circumstances regarding the pills.

9. The Plaintiff, with Fappiano present and acting on Fappiano's advice, moved the pills to the evidence room and documented the pills in the Department's evidence manifest.

10. Both the Plaintiff and Fappiano understood that all of their actions were subject to constant video surveillance. In addition, their plans had been

discussed in the presence of their supervisor Defendant Cartledge.

11. The Plaintiff's relationship with Fappiano deteriorated subsequent to the conversations regarding relocation of the pills from the disposal box to the evidence room. Fappiano was a long-term employee of the department who became a subordinate of the Plaintiff in the Detective Bureau and did not agree with actions taken after the Plaintiff became his supervisor. In addition, Fappiano is close friends with another former high-ranking employee (hereinafter "Individual 1") of the Department who resigned from the Department.

12. The resignation of Individual 1 was, in part, the result of the Plaintiff's participation in the report of Individual 1's improper conduct to the former Chief of Police.

13. Subsequent to Individual 1's retirement, Defendant Kasper was promoted to Captain and the Plaintiff was promoted to the position of Detective Lieutenant.

14. The individual Defendants maintained close personal relations with certain other NPD police officers who reported directly to the Plaintiff in his position of Detective Lieutenant. Said other officers disagreed with the manner in which the Plaintiff supervised the Detective Bureau.

15. Fappiano and the Defendants eventually began a series of malicious retaliatory actions against the Plaintiff. Fappiano and the Defendants were motivated to improperly act against the Plaintiff by, <u>inter alia</u>, their friendships with other employees who were plaintiff's subordinates in the Detective Bureau, and Individual 1.

16. In or about August 2017, Kasper, now the Chief of Police, received an anonymous letter authored by an unknown person, identified herein as John Doe, ("the August 2017 letter") by mail which falsely and maliciously made certain allegations related to the Plaintiff. The correspondence stated as follows:

*Since you don't have a freaking clue about what actually goes on inside these 4 walls, here is a hint for you—Check the camera that eyes the drug*

3

*drop box around the time that the overdose occurred involving [an individual.]. Why would a supervisor be opening and digging through it and then removing pills from it?? You should ask your detective head.  You may want to piss test him too.  He's cycling and has been for years.  Time for him to go.*

17. The allegations within the letter were directed at the Plaintiff as he was, at the time, the head of the Detective division.

18. The individual Defendants agreed to maliciously damage the Plaintiff through the use of their positions as supervisors in the NPD in order to promote their own interests and the interests of their friends.

19. Though the Defendants knew there was no basis for the anonymous allegations, Defendant Kasper directed that an internal affairs investigation be conducted into allegations that the Plaintiff "improperly removed pills from the drug drop box in the [NPD] lobby" and was – and had been "using illegal steroids … for years[.]"

20. By established NPD policy, any investigation should have been conducted by Defendant Cartledge.  Kasper, however, claiming that she wanted to avoid any allegation of "favoritism" towards the Plaintiff, hired an outside investigator, APD Management, to conduct an investigation into the anonymous allegations in the August 2017 letter.

21. The investigation began in September 2017.  While APD management was hired to conduct the investigation independently, the Defendants improperly remained active participants and interfered with the investigation.

22. The Defendants actively concealed material information that was exculpatory to Plaintiff from APD.

23. Defendant Kasper insisted that she – and not APD – conduct an interview of Defendant Cartledge regarding his knowledge and involvement in the underlying transfer of pills from the disposal box to the evidence room.  Kasper informed APD that Defendant Cartledge had no knowledge material to the investigation but subsequently, under oath, testified that she had disciplined Defendant

Cartledge because he had did have knowledge of the events and did not act appropriately when he became aware.

24. The Plaintiff was placed on administrative leave by the Defendants on September 18, 2017.

25. On or around September 21, 2017, the Defendants notified local media outlets that the Plaintiff had been placed on administrative leave.

26. Defendant Kasper stated to local media outlets that the Plaintiff was placed on administrative leave and would not be permitted to work on police detail assignments.

27. In late September 2017, the Defendants informed numerous others in the department that the investigation into the Plaintiff was unsubstantiated and that, as such, the Plaintiff would soon be returning to his position at the head of the Detective Bureau.

28. Fappiano was frustrated when he became aware the investigation into the Plaintiff was unsubstantiated and the Plaintiff would soon be returning to his position at the head of the Detective Bureau.

29. Fappiano was particularly concerned that he would be accused of sending the August 17 correspondence.

30. Defendant Kasper inappropriately requested that Fappiano, a subordinate of the Plaintiff, meet with her and the other individual Defendants to discuss discipline that could be imposed on the Plaintiff. This meeting was kept secret from APD Management, the company brought in by Defendant Kasper in order to provide an independent investigation.

31. At this meeting: (a) Fappiano, a percipient witness, was given confidential information about the ongoing investigation; (b) Fappiano accused Defendant Cartledge of being personally responsible for any violation under consideration because he (Cartledge) was present when Fappiano and the Plaintiff discussed the need to move the pills; (c) Fappiano was informed that the investigation against the Plaintiff was not going to result in any substantial discipline and, in response, he demanded that the Plaintiff be punished; (d) Defendant Kasper expressly and maliciously probed Fappiano for information that

could be used as a pretext for new charges against the Plaintiff; and (e) the individual Defendants actively conspired to develop charges and allegations against the Plaintiff.

32. Based on the agreement reached in the meeting described in Pars. 30 and 31 above, defendants Kasper and Cartledge conducted interviews of several current and former employees of the Detective Bureau. This was also kept secret from APD Management.

33. A few days later, while the first investigation was pending, the individual Defendants maliciously authored and initiated a new Internal Affairs Complaint against the Plaintiff, falsely accusing him of violating his responsibilities and duties as the Supervisor of the Detective Bureau.

34. The complaint falsely and maliciously accused the Plaintiff of violating rules related to, inter alia, "bullying" employees, years earlier driving a police car with a civilian in it, making comments "bashing" the NPD, years earlier calling out sick one day when he was not sick, criticizing Defendant Cartledge, and leaving a police detail one hour early. These charges were false, unsubstantiated or related to behavior that similarly situated employees actually engaged in without punishment.

35. The complaint did not name any witness or complainant.

36. The complaint was defamatory and did not specify a date of incident.

37. Notwithstanding that there was already and independent investigation pending by APD and that she had previously determined that the individual Defendants were conflicted, Defendant Kasper nonetheless assigned Defendant Clayton to conduct the investigation into the second IA complaint.

38. All of the individual Defendants remained actively involved – despite conflicts of interest – in the investigations of the Plaintiff in order to ensure that he was found to have violated Department rules.

6

39. APD was not informed of the second investigation, that the interviews related to a second investigation were taking place or the depth of Cartledge's involvement in – and knowledge of – the events as alleged by Fappiano.

40. On October 16, 2017 the Plaintiff met with the individual Defendants. At that time, the Plaintiff was informed that the first IA had been completed and that he was to be suspended for two days without pay and removed from the Detective Bureau.

41. On that same day, the individual Defendants informed the Plaintiff that he was now the subject of the second IA and that Captain Clayton would be conducting that investigation. The Defendants also removed Borowski from his position as the head of the Detective Unit.

42. The Defendants maliciously drafted and published a "Notice of (2) Day Suspension", signed by Defendant Cartledge, which contained known false and malicious allegations of wrongdoing and/or pretextual allegations of wrongdoing asserted by the Defendants.

43. On or about October 20, 2017, Kasper, knowing that the underlying basis for the Plaintiff's removal from the Detective Division was false and pretextual, published to the media that Borowski had been removed as head of the Detective Bureau.

44. On or about November 1, 2017, Defendant Kasper stated again to the media that the Plaintiff remained on administrative leave and provided to the media internal police documents stating that an officer could only be placed on administrative leave if he or she is deemed to be "physically or psychologically unfit for duty" or "pending disposition of an internal investigation where it would be unwise or improper for the officer to continue on duty."

45. On November 7th, 2017, the Plaintiff was suspended for three (3) days by the individual Defendants based upon sham charges associated with the second IA (internal affairs) report. The Defendants maliciously drafted and published a "Notice of (3) Day Suspension", signed by Defendant Cartledge, which contained known false and/or pretextural allegations of wrongdoing that were manufactured by the Defendants.

46. On November 9, 2017, Defendant Kasper maliciously and falsely stated to local media outlets, inter alia, that the Plaintiff had "made an error in judgment and failed to comply with the department policies regarding the drop box, evidence and property handling procedures and properly documenting the circumstances of the event."

47. Defendant Kasper also maliciously and falsely stated that "additional workplace rules had been violated." Media outlets published these and other defamatory information regarding the Plaintiff.

48. On November 24, 2017, the Plaintiff returned to duty from administrative leave and the suspensions. He was no longer in command of the Detective Bureau and was instead assigned as a Shift Commander.

49. On December 7, 2017, the Plaintiff and NPD received a second anonymous letter (the December 7 Correspondence) that read as follows:

*Humiliate and embarrass in public eye     COMPLETE AND ONGOING*
*Cause loss of Detective Lt position        COMPLETED*
*Insure disciplinary action/record          COMPLETED*
*Contribute to demotion                     ONGOING*
*Cause loss of job and retirement           PENDING*

*Your every move will be watched – both inside this building on duty and outside this building off duty. I know and have seen you inside where you now hang out in Easthampton. Behave yourself because you will be watched. You have got away with a lot of shit in the past – up until now! You are a back-stabbing disloyal prick who only cares about yourself. It is time for you to pay for all your misdeeds, tough guy. You'd be better of (sic) to retire now while you still can and before you are fired.*

50. The Plaintiff demanded that a criminal investigation be conducted to determine who was responsible for the threatening correspondence including an investigation specifically into whether Fappiano was responsible or involved.

51. Defendant Kasper testified under oath in an arbitration hearing on plaintiff's first suspension that she in fact suspected that Fappiano was involved with the threatening correspondence, but that she refused to investigate

        Fappiano because she claimed it would not look appropriate as Fappiano was the main witness against the Plaintiff.

52. The Plaintiff also demanded that NPD refer the matter to the Attorney General for investigation but the Defendants refused.

53. On January 25, 2018, Defendant Kasper and others received a third anonymous letter (the January 25 correspondence) that read as follows:

*To: Northampton PD; Mass State Police; Attorney General's Office. [An individual] in Northampton, is and has been for several years, running an illegal Super Bowl Betting pool. It consists of 100 squares (10 across/10 rows and drawn numbers from 0-9 (2 columns of numbers). Each square is purchased for $50 a piece=$50,000! You have members of the Northampton Police Department participating in this, including the recently demoted Detective Lieutenant. There are also prominent members of the Noho community involved in this.*

54. The January 26 Correspondence was also sent to the Attorney General's Office who began an investigation and contacted the individual Defendants.

55. Defendant Kasper told the investigators from the Attorney General's office that Fappiano – who she suspected of involvement in the drafting of the previous letters – should be their contact with NPD and could aid in the investigation.

56. Kasper told the investigators that Fappiano "knew the players" and could help them with the investigation.

57. Kasper recommended Fappiano in order to deliberately and maliciously compromise the criminal investigation.

58. The Plaintiff was not informed of the January 25th correspondence until March 2018, at which point the Defendants informed him that he was cleared of all charges.

59. Notwithstanding the Plaintiffs demands that the Defendants investigate the origins of the defamatory, malicious and false attacks on the Plaintiff, or enlist other law enforcement to do so, the Defendants undertook

no authentic or good faith investigation into the origins of the letters.

60. Indeed, the Defendants caused the Department's official records to be altered from denoting a criminal investigation of the crime of Criminal Harassment in violation of MGL c. 265 Sec. 43A to the status of "No Crime Involved" and "Anonymous Letters," specifically in order to prevent scientific testing or further investigation by the Federal Bureau of Investigation which would only submit cases for DNA lab testing that were associated with criminal charges.

61. By doing so, the Defendants, by design, ultimately prevented discovery by any other agency of the origins of the defamatory correspondence and deliberately impeded the criminal investigation. The crimes remain unsolved.

62. An independent arbitrator eventually heard the Plaintiff's grievance of his initial (October 16, 2017 two-day suspension) discipline and determined that there was no just cause for the discipline imposed by the Defendants. She ordered that the discipline be rescinded and the plaintiff be paid all lost wages associated with the suspension.

63. The arbitrator correctly found, <u>inter alia</u>, that in conducting their investigation and imposing discipline, the Defendants: (1) had acted in a manner that was "not fair" to the Plaintiff; (2) did not conduct a "fair and complete" investigation of the Plaintiff; (3) did not conduct the investigation with a proper "degree of professional competence"; and (4) did not demonstrate the necessary concern for the Plaintiff's individual rights.

64. The second set of charges involving (the November 7, 2017 three-day suspension) were vacated by the Defendants, and the second suspension was similarly rescinded.

65. Defendant Kasper has continued to attempt to harass and embarrass the Plaintiff by, for instance, initiating an inquiry into the Plaintiff that had no basis in fact regarding inappropriate behavior towards a citizen during the summer of 2020, and, by way of another example, bypassing him for promotion to Captain.

## COUNT 1
### CLAIM UNDER MASSACHUSETTS CIVIL RIGHTS ACT
### Against Individual Defendants

66. All previous paragraphs are incorporated herein.

67. By the actions above, the Defendants interfered with or attempted to interfere with Borowski's exercise or enjoyment of Constitutional and Statutory rights.

68. Such interference was by threats, intimidation, or coercion.

69. As direct and proximate result thereof, the Plaintiff suffered damages.

## COUNT 2
### CLAIM FOR DEFAMATION
### Against Individual Defendants

70. All previous paragraphs are incorporated herein.

71. The Defendants, with actual malice, caused statements about and concerning Plaintiff to be published to third parties, which were defamatory and false.

72. The statements concerned the Plaintiffs vocation and craft.

73. As a direct and proximate result, the Plaintiff suffered damages.

## COUNT 3
### CLAIM FOR INTERFERENCE WITH CONTRACT AND/OR ADVANTAGEOUS BUSINESS RELATIONSHIP
### Against Individual Defendants

74. All previous paragraphs of this Complaint are incorporated herein.

75. The Plaintiff had a contract or a business relationship which contemplated economic benefit with the City of Northampton including the continued maintenance of his position has the leader of the detective unit.

76. The Defendants had knowledge of the contract and business relationship.

77. The Defendants, with malice, intentional interfered with the contract or business relationship for an improper purpose and by improper means.

78. As a direct and proximate result thereof, the Plaintiff suffered damages.

## COUNT 4
## CIVIL CONSPIRACY
### Against Individual Defendants

79. All previous paragraphs of this Complaint are incorporated herein.

80. By virtue of, inter alia, their supervisory positions over the Plaintiff, the Defendants acting in unison held a peculiar power of coercion over the Plaintiff that they would not have had if they had acted independently.

81. The individual Defendants, by design and/or an agreement maliciously defamed the Plaintiff, damaged his career, humiliated him in the public eye, interfered with the Plaintiff's career and employment with the City.

82. The individual Defendants committed acts in furtherance of wrongful design or agreement.

83. As a direct and proximate result thereof, the Plaintiff sustained damages.

## COUNT 5
## CLAIMS FOR VIOLATION OF 42 USC SEC. 1983
### Against All Defendants

84. All previous paragraphs of this Complaint are incorporated herein.

85. At all times relevant hereto, the individual Defendants acted under color of state law.

86. At all times relevant hereto, the individual Defendants were municipal policymakers for the Defendant City responsible for the promulgation and implementation of policy for the Defendant City.

87. As a direct and proximate result of the Defendants actions, the Plaintiff was deprived of rights and privileges secured by the Constitution and Laws of the United States of American, including, but not limited to, the right to Due Process and Equal Protection under the laws.

88. As a direct and proximate result thereof, the Plaintiff sustained damages.

## COUNT 6
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Against Individual Defendants

89. All previous paragraphs of this Complaint are incorporated herein.

90. The Defendants intended to inflict emotional distress on the Plaintiff or knew or should have known that their actions would result in the infliction of severe emotional distress.

91. The actions of the Defendants were extreme and outrageous, beyond all bounds of decency and utterly intolerable in civilized society.

92. The actions of the Defendants caused and continues to cause the Plaintiff emotional distress.

93. The emotional distress of the Plaintiff was severe, included physical manifestations and was of a nature that no reasonable person should be expected to endure.

94. The Plaintiff sustained damages.

WHEREFORE the Plaintiff demands judgment on all counts asserted herein to the full extent available under the applicable law including all general and special damages, punitive or multiple damages, attorney fees and costs and any other applicable relief this Court deems just and appropriate, plus all applicable interest.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS.**

The Plaintiff,
By his lawyers,

_____
Peter J. Perroni
BBO#: 634716
Gary G. Nolan
BBO#: 634907
Nolan | Perroni, P.C.
73 Princeton Street, Suite 306
N. Chelmsford, MA 01863
(978)454-3800
Dated: August 17, 2020